**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  06-366 (RWR)** |
| | : | |
| **REGINALD BIZZELL,** | : | |
| **RODRIQUEZ SEEGERS,** | : | |
| **Defendants.** | : | |
| _____ | : | |

**UNITED STATES' OMNIBUS OPPOSITION**
**TO DEFENDANTS' PRETRIAL MOTIONS**

The defendants have filed numerous pleadings including motions to suppress statements

and evidence.  This Omnibus Opposition will address these motions seriatim.

**Background**

On December 19, 2006, each defendant was indicted in different counts of the same

indictment for Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable

by Imprisonment for a Term Exceeding One Year, in violation of Title18, United States Code,

Section 922(g)(1).

At a hearing or trial in this matter, government counsel expects the evidence to

demonstrate substantially the following facts.  On November 22, 2006 at about 2:50 a.m. United

States Park Police (USPP) Joseph Bellino monitored Prince Georges County channel 4 radio

broadcast for shots fired at the Tradewinds Night Club.  Having patrolled the traffic leaving

Tradewinds on numerous occasions, Officer Bellino knew that many patrons leave Tradewinds

for the District by way of Branch Avenue to the Suitland Parkway.  In response to the dispatch

for shots fired at the Tradewinds Night Club, Officer Bellino decided to position himself to

monitor traffic coming into the District by way of Branch Avenue and Suitland Parkway in his

marked cruiser.  Shortly thereafter, Officer Bellino observed a white Buick Regal heading onto the Suitland Parkway at a high rate of speed,  with no headlights, and weaving in and out of traffic.  The vehicle was traveling at a high rate of speed down Branch Avenue towards the District coming towards Bellino on the Suitland Parkway.  The vehicle passed another car and crossed the median and into the oncoming lanes and then got on the ramp for the Suitland Parkway.  Believing that this vehicle may have had something to do with the shooting, Bellino got behind the vehicle with his overhead lights and siren activated.  The Buick continued to flee at a high rate of speed until the driver lost control and crashed into a tree at Southern Avenue at 6th Street, N.E..

Defendant Seegers bailed out of the driver's seat of the vehicle, initially running on the sidewalk near the Buick while stopping briefly to reach into the waiste area of his clothing.  After the brief stop, Seegers, continued running up the sidewalk.  In the meanwhile, Officer Bellino exited his cruiser and was chasing Seegers on foot in the street parallell to the sidewalk.  Officer Bellino heard the sound of metal hit the sidewalk where Seegers was observed reaching into the waiste area of his clothing.  No one else was present and Bellino's priority was to apprehend Seegers.  Bellino continued to run parallel to Seegers in the street and finally catching him about two blocks away.

United States Park Police Bellino placed handcuffs on Seegers and escorted him back to the cruiser which happened to be a retrace of the path of the chase including the location where USPP Bellino heard metal hit the sidewalk.  During this escort, USPP Bellino dispatched a lookout of the passenger over the radio for the sole purpose of providing identification

information to his colleagues so they would apprehend the passenger if spotted.[1]  The dispatch to his radio was for a medium brown skinned female with long braids and a white shirt.  In response to hearing that description of the passenger, later identified as defendant Bizzell - who wore long braids and a white tee shirt -  defendant Seegers blurted, "no, it was a male."  In addition, right on the ground in front of the Buick, where Seegers was observed reaching into the waist area of his clothing and where Bellino heard the sound of metal hit the sidewalk, a .380 cal semi-automatic pistol was recovered as if abandoned.

During the foot chase, Metropolitan Police Department (MPD) Sgt. Richard Harger arrived at the scene in response to Bellino's radio broadcast.  While driving towards the crashed vehicle, Harger slowed down and observed defendant Bizzell getting out of the front passenger seat of the Buick.  Not knowing Bizzell was one of the suspects at the time, Harger continued to drive down the street to locate Bellino.  USPP Jason Omo also arrived to assist USPP Bellino.  As USPP Omo drove slowly past the Buick he saw defendant Bizzell standing in the rear of the vehicle on the driver's side next to the rear wheel and continued driving towards Bellino.  United Stated Park Police Omo slowed down to stop at the Buick and Bizzell pointed down the street toward Galveston.  Not knowing Bizzell was one of the suspects at the time, USPP Omo continued slowly down the street and met up with MPD Sgt. Harger.  By this point, MPD Sgt. Harger learned who the suspects were and pointed back toward the Buick and told USPP Omo to "get that guy [Bizzell]."  When USPP Omo turned around Bizzell was no longer in the area.

---

[1] Provided to defense in discovery.

After Seegers' arrest, the officers searched the entire passenger compartment of the Buick since it was under Seegers' personal control.  Six 9mm shell casings were recovered from the Buick - - three shell casings on the driver's side floor board and three shell casings under the driver's seat.  Mail matter and repair bills in Seegers name were found in the map pocket on the driver's seat.   In addition to items belonging to Seegers, a wallet that contained Bizzell's driver's license and identification was recovered from the front passenger side floor board, despite Seegers' denial that he knew Bizzell.

While the officers were processing the Buick, they positively saw Bizzell exit a wooded area and walk down Southern Avenue away from the scene as if he was an innocent bystander.  Bizzell was stopped and placed under arrest.  Bizzell stated that he had just left his girlfriend's home and was walking to his residence and had nothing to do with the vehicle pursuit.  Search of Bizzell incident to arrest revealed a cell phone and a card advertising the Trade Winds Night Club from his pockets.  Seegers and Bizzell were placed in a cruiser for transport.

A tow truck was brought to the scene to tow the Buick to the police impound lot.  When the tow truck pulled the Buick back from the tree into which Seegers had crashed, officers saw a second gun - - a ministorm 9mm pistol - - lying on the ground where Bizzell was standing during the chase.[2]

---

[2] The pistol had one spent shell casing in the chamber and two live rounds in the magazine. All of the ammunition in the pistol had the brand name of "WIN".  One of the 9mm shell casings that had been recovered from inside the Buick had the brand name of "WIN" and the other five shell casings that had been recovered in the Buick had the brand name "FC".

Bizzell and Seegers were transported to the station and placed in separate cells. While the defendants were waiting to be processed the officers overheard defendants talking to each other. Officer Bellino recorded the following conversation in his notebook as the defendants spoke with each other:

| | |
|---|---|
| Seegers: | Yo Homie. |
| Bizzell: | Yeh. |
| Seegers: | Both. They got both. |
| Bizzell: | Yeh. I know. I already chalked that one up. |
| Seegers: | Both. |
| Bizzell: | Yeh. Man, I was in the house. |
| Seegers: | Both. |
| Bizzell: | Yeah. I left that one on the car. I got rid of it before I went in the house. |
| Seegers: | We are done. |
| Bizzell: | Did they do that gun powder shit on you too? |
| Seegers: | Yea. Damn we are done. We are through. |
| Bizzell: | Yea, I know. |

While at the police station, each defendant gave videotaped statements in response to police questioning after they were advised of their Fifth and Sixth Amendment rights. As the videotapes show, neither defendant was threatened, physically abused, made promises of leniency , tricked, were of sound mental and physical condition, and the length of questioning was less than one hour. In their statements, they deny being with each other and all facts relating to the offense with which they are charged.

On November 27, 2006, USPP Bellino presented two Applications and Affidavits in Support of Search Warrants to U.S. Magistrate Judge Alan Kay of the U.S. District Court for the District of Columbia. The application and affidavit requested authority to search the entire premises of 133 Irvington Street, Apartment #205, SW - the residence of Seegers - and 300 Livingston Terrace, Apartment #5, SE the residence of Bizzell. Magistrate Kay reviewed the

applications and affidavits, concluded that each established probable cause to believe that a variety of items, including evidence related to items described in USPP Bellino's Affidavits would be found on the described premises, and authorized the search warrants. A copy of the search warrants and affidavits are attached. The search warrants were executed on November 28, 2006.

Recovered from Seegers' residence was mail matter belonging to him and a tablet of suspected Ecstacy. Recovered from Bizzell's residence Bizzell's mail matter, photographs, and personal belongings within certain drawers of dressers within the bedroom and on one side of a shared closet inside of the bedroom. The other side of the closet contained female items. On Bizzell's side of the closet, MPD officers found a Savage 20 gauge shotgun model 220L-E 20 serial #P306936 wrapped in a purple Bucks basketball jersey similar to one Bizzell wore in displayed photographs throughout the apartment.[3] Officers also found drug paraphernalia (empty ziplocks), earplugs, and 30 grams of suspected marijuana.

On January 22, 2007, Seegers moved to suppress all evidence flowing from his "unlawful stop," including the pistol he abandoned, his statement ("it was a male") he blurted, and all evidence seized from the passenger compartment of the vehicle he was driving, on the grounds that the stop was in violation of United States v. Hill, 131 F. 3rd 1056 (D.C. Cir. 1997). In addition, he moved to suppress his videotaped statement on the grounds that the statements were obtained involuntarily, therefore in violation of Miranda v. Arizona, 384 U.S. 436 (1966). His motions are without merit and should be denied.

---

[3] DNA samples were taken from the shot gun and sent to FBI for analysis. An expedited analysis was requested.

On January 22, 2007, defendant Bizzell moved this court to suppress his videotaped statement as unreliable and in violation of Arizona v. Fulminante, 499 U.S. 279 (1991) and Mincey v. Arizona, 437 U.S. 385 (1978), due to the "belligerent, caustic, and mendacious manner in which the detective questioned the Bizzell.  Bizzell also moves this court to suppress all evidence seized pursuant to the search warrant of his residence alleging that the search warrant was not based on probable cause.  On February 2, 2007, Bizzell supplemented his motion to suppress evidence obtained pursuant to the search warrant.  Bizzell's motions are without merit and should be denied.

## ARGUMENT

1.    **The warrantless arrest of defendant Seegers was lawful and based on probable cause.**

Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, that would lead the officer to believe that a criminal offense had been or is being committed.  See United States v. Green, 216 U.S. App D.C. 329, 670 F. 2d 1148 (1981); Brinegar v. United States, 338 U.S. 160 (1949).  As explained by the District of Columbia Court of Appeals,

> probable cause exists 'where the facts and circumstances within . . . [the police officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," Price v. United States, 429 A.2d 514, 517 (D.C. 1981); [t]he question is what constituted probable cause in the eyes of the reasonable, cautious and prudent police officer under the circumstances of the moment.  Id. At 517-518 (quoting Bell v. United States, 102 U.S. App. D.C. 383, 254 F.2d 82, 86 cert. denied, 358 U.S. 885 (1958)).

7

The Fourth Amendment generally permits police to make warrantless arrests upon probable cause for misdemeanors committed in their presence and for any felony.  United States v. Watson, 423 U.S. 411 (1976).   Clearly, USPP Bellino had probable cause for arresting Seegers.  Seegers had just violated more than three traffic laws for which he was issued citations, he failed a Field Sobriety Test and was found to be driving under the influence of alcohol, and he knowingly fled from a police officer while committing those infractions.  Indeed, USPP Bellino had his police equipment activated during the high speed chase. As a convicted felon, Seegers was clearly aware that he was being pursued by an officer.  In addition to the facts surrounding the shooting that had just occurred, the unprovoked flight, the officer's experience in this part of the City and the defendant's manner of driving, the totality of circumstances clearly suggest probable cause for Seegers' arrest.

**2.      The search of Seegers' entire passenger compartment of the vehicle he drove was a lawful search incident to a lawful arrest, therefore the fruits of the search should not be suppressed.**

After making a valid arrest, the police may search a car incident to the arrest of an occupant or a "recent occupant" of the car.  See Thornton v. United States, 541 U.S. 615 (2004) (defendant had just exited car and was next to it when search occurred).  Seegers status as a recent occupant turns "on his temporal or spacial relationship to the car at the time of the arrest and search." Id. at 621.  Immediately after Seegers crashed into the tree, he bailed out and was caught only two blocks away with in seconds.  The officer witnessed the crash and the flight. The incident happened so quickly that Seegers must be considered a recent occupant of the vehicle and therefore the search was lawful under Thorton.  Automobile searches extend to all parts of the vehicle, and closed containers therein, that might conceal the object of the search.

8

California v. Acevedo, 111 S. Ct. 1982 (1991). Since we have a valid arrest of Seegers and a

.380 cal semi-automatic pistol was discovered in a location where defendant Seegers was seen

manipulating the waist area of his clothing and where metal was heard hitting the sidewalk in

front of his vehicle, the officers clearly had probable cause to search the passenger compartment

of the vehicle that Seegers was driving.[4]   Therefore, defendant's motion to suppress the fruits of

the search should be denied.

**3.      The defendant has no expectation of privacy in .38 semi-automatic pistol that he
threw to the ground during the chase**

As Justice Harlan explained in his concurring opinion in Katz v. United States, 389 U.S.

347, 361 (1967), a "reasonable," or "legitimate" or constitutionally protected expectation of

privacy must have two parts: "first, that a person have exhibited an actual (subjective)

expectation of privacy and, second, that the expectation be one that society is prepared to

recognize as "reasonable.'" Here, the defendant exhibited no actual or subjective expectation of

privacy in the pistol when he threw it to the ground and second, the District has outlawed

ownership or possession of a gun by any one other than certain individuals in law enforcement.

So, even if the defendant exhibited a subjective expectation of privacy, the District would not

recognize an expectation of privacy in the possession of a pistol by a convicted felon.  In any

event, the defendant abandoned the pistol when he threw it away during the chase by police

Bellino relinquishing any expectation of privacy.  See United States v. Thomas, 864 F.2ds 843

(D.C. Cir 1989)

---

[4] An argument by the defendant that the search of the vehicle was unlawful because it occurred
after the chase would fail because searches incident to arrest need not precisely coincide with the
timing of he arrest.  See, e.g., United States v. Edwards, 415 U.S. 800 (1974).

9

**4.    The video taped statements**

**A.    Defendants Knowingly, Intelligent, and Voluntarily  Waived Their Miranda Rights**

The Due Process Clause of the Fifth Amendment bars the admission in a federal criminal trial of admissions or confessions that were made involuntarily.  See Mincey v. Arizona, 437 U.S. 385, 398 (1978).  However, when an accused challenges the admissibility of a confession or admission on the grounds of involuntariness, the government need only prove voluntariness by a preponderance of the evidence.  See Lego v. Twomey, 404 U.S. 477, 488-89 (1972); United States v. Bernett, 161 U.S. App. D.C. 363, 381 n. 140, 495 F.2d 943, 961 n. 140 (1974).   The Supreme Court has indicated that voluntariness should be determined with reference to the totality of the circumstances, and that the ultimate question is whether the suspect's "will has been overborne" by "coercive police activity."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

A waiver is knowing and valid when "made with a full awareness both of the right being abandoned and the consequences of the decision to abandon it."  Colorado v. Spring, 479 U.S. 564, 573 (1987).  That is, the suspect must understand the nature of the Miranda rights and the general consequences of making a statement -- i.e., that it can be used to incriminate the suspect. See also, United States v. Bradshaw, 935 F.2d 295 (D.C. Cir. 1991) (valid waiver determined by voluntariness of decision to waive and by whether the decision to waive was made with "full awareness" of "nature" of waived rights, and consequences of waiver) (without citations).

Here, the evidence will establish that, before making their video taped statements each defendant was properly advised of his Miranda rights as a precaution.  In addition, the interviews took place about four hours after the arrest and two hours after defendant Seegers' alcohol blood

10

level tested at .086, slightly above the legal limit for alcohol consumption.  The video tapes will also show that there was no physical abuse by officers, no threat of job loss or threat of any harm of any kind, no promises of leniency, no trickery to produce an untrue statement, the length of questioning did not exceed one hour, the defendants were in good mental and physical condition, they were offered some water, they were not youths - 27 and 31 years old - and they are both felons with exposure to the criminal justice system.  Moreover, where, as demonstrated by the PD-47s in the present case, the defendants explicitly waived their rights, there exists powerful evidence of the legitimacy of the waiver.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979) (express waiver is strong proof of validity of the waiver), United States v. Yunis, 859 F.2d 953, 961-962 (D.C. Cir. 1988) ("[t]he administration of proper Miranda warnings, followed by a written waiver of the rights ... will usually go far toward demonstrating that a decision to speak is not compelled") (without citations). Under the totality of the circumstances, the defendants knowingly, intelligently and voluntarily waived their Fifth and Sixth Amendment rights.

**B.     Defendants' Statements Are the Product of an Essentially Free and Unconstrained Choice and Are Admissible for Impeachment**

Even assuming, arguendo, that officers violated Miranda in obtaining the defendant's statements, they are still admissible at trial for impeachment purposes due to their voluntariness. Harris v. New York, 401 U.S. 222, 224-26 (1971); United States v. Moore, 104 F.3d 377, 388 (D.C. Cir. 1997) (noting use of statements made in violation of Miranda as impeachment material).  A statement is voluntary for purpose of due process so long as the statements are "the product of an essentially free and unconstrained choice by its maker."  Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973); Jackson v. United States, 404 A.2d 911 (D.C. 1979)

(quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  Factors to be considered include the age of the accused, his lack of education or level of intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. No single criterion is controlling.

As stated above, all factors indicate the defendants statements were voluntary.  Moreover, each defendant comfortably and persistently insisted on answers provided even when the detective said he did not believe them; they stuck by their story of denial refusing to "say anything that they did not remember."  Even if this Court decides to suppress the statement for use in the government's case in chief, the statements should be admissible for impeachment regardless of the outcome of suppression motion hearing.

### C.    Seegers' blurted statement, "no, it was a male" is not the subject of custodial interrogation and should be admissible for identification purposes

If a suspect is in custody, but volunteers a statement in the absence of interrogation, there is no Miranda e.g., Miranda 384 U.S. at 478; Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Seeger's correction of USPP Bellino's description of the passenger as a female with long braids by voluntarily stating, "no, it [the passenger] was a male" was not the product of interrogation and therefore is admissible.

5.    **Search Warrant for Bizzell's Residence[5]**

    A.    **The totality of the circumstances surrounding the search warrant for Bizzell's apartment demonstrated probable cause for the search, and all evidence obtained therefrom should be admitted**

The Fourth Amendment of the U.S. Constitution provides that "no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV.   The existence of probable cause should be measured by examining the "totality of the circumstances" surrounding issuance of the warrant. See Illinois v. Gates, 462 U.S. 213, 230-31 (1983).  This standard is a "practical, nontechnical conception" measured against the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." See Brinegar v. United States, 338 U.S. 160, 175-76 (1949).  The magistrate issuing the warrant is tasked with inquiring whether, "given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; Accord United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (per curiam).  The affadivit from the police officer need only set forth sufficient facts for a "reasonably prudent person" to believe evidence of a crime will be found. United States v. Laws, 808 F.2d 92, 94 (D.C. Cir. 1986).

Some guideposts exist for judges to organize this analysis.  For example, there is a "nexus" requirement, which asks magistrates to ensure that there is "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).  However, wide latitude and "great deference" is afforded to the magistrate judge's decision. Spinelli v. United States, 393 U.S. 410,

---

[5]/ If Seegers made the same claim, the same arguments would be made by the government.

419 (1969); See also United States v. Ventresca, 380 U.S. 102, 108-09 (1965).  In reviewing a

magistrate's issuance of a search warrant, the court must only determine whether the magistrate

had a "substantial basis for determining the existence of probable cause."  Gates, 462 U.S. at

239; Accord United States v.Warren, 42 F.3d 647, 652 (D.C. Cir. 1994).

     Here, Officer Bellino observed Seegers driving erratically coming from the direction

where gunshots were just fired.  Seegers fled from Bellino for no reason.  During the foot chase,

Bellino observes Seegers manipulating his waistline area and shortly thereafter hears metal hit

the sidewalk.  Officers Harger and Omo sees Bizzell standing behind the Buick.  Officers

discovered two firearms where each defendants' was located.  In addition, the vehicle out of

which the defendants bailed contained ammunition of the same type matching the weapons found

outside of the vehicle.  A conversation between the defendants is overheard and recorded in

writing by Officer Bellino where Defendant Seegers told Defendant Bizell that "they got both,"

presumably referring to the firearms, and that "we are through," upon learning that gunpowder

tests had been conducted on both defendants.  Based on the officers' experience, individuals who

possess firearms outside of the home store such contraband inside of the home.

     With this substantial evidence of probable cause, Officer Bellino submitted an affadavit

and were granted a search warrant for Bizell's apartment by Magistrate Judge Alan Kay on

November 28, six days after the incident.  The affadavit delineated four reasonable rationale for

why, "based upon [Officer Bellino's] professional training, experience and as an officer

enforcing criminal laws against illegal gun possession, and [his] work with other veteran police

officers and detectives," he believed the search was justified.  It stated:

- "Persons who keep or carry guns illegally commonly retain items associated with their firearms long after they have bought or got the guns, including the original manufacturer's packaging, gun-cleaning equipment, and additional parts, such as gun sighs, and taht these are almost always stored in the gun-possessor's home; in particular gun-cleaning equipment, which is evidence of illegal gun possession; normally is not carried ona person with a gun, but kept at home, to be used periodically to keep a gun "in shape" or good working order and that such gun possessors buy or get and keep in storage extra ammunition for their firearms, beyond the immediate capacity of the particular firearm; and that they keep such additional ammunition in their homes....

- It is quite common for a person who possesses a firearm to own or possess additional firearms, and that it is common for a person who is found carrying a firearm on his person or in his vehicle to have stored at home one or more additional firearms, along with additional ammunition, and papers related to the acquisition of that firearm....;

- Many persons who illegally possess guns often have pictures taken of themselves with friends in which they display their gun or guns, and that these pictures, themselves excellent evidence of illegal gun possession, [are] commonly kept at the gun possessor's home or in their room at their homes, along with gun paraphernalia;

- Even after an individual's arrest for gun-related charges, the person's family and associates commonly do not dispose of other firearms or ammunition; and even if they do get rid of other guns, they are much less likely to get rid of ammunition, possession fo which almost always [is] a crime in Washington D.C.  Further, hardly ever do such associates remove or get rid of gun packaging or cleaning equipment or photographs of a person with a gun, and ... such items will remain at the arrested individual's home for a considerable period of time after such arrest."

Based upon this affidavit, the magistrate granted the search warrant for Bizzell's

residence,[6] presumably because he determined that there was "a fair probability that contraband

or evidence of a crime [would] be found [there]." Gates, 462 U.S. at 238.  In order to make that

determination, he must have concluded, per the Supreme Court and D.C. Circuit Courts'

---

[6] A search warrant was issued for Seegers' residence as well.

guidance, that a "reasonable prudent person" would have seen a sufficient nexus between the

defendants' possession of firearms under the Buick and evidence of other firearm possession at

Bizell's apartment.  True to that prediction, a shotgun was found at Bizell's apartment, wrapped

in a Milwaukee Bucks jersee he was pictured wearing all over the house.  Given this established

nexus, it is apparent that the search warrant was supported by probable cause, and that its results

should be admissible.  And, per the Supreme Court's instruction, this determination by the

magistrate should be entitled to "great deference."  Spinelli, 393 U.S. at 419.

This result is supported by an examination of other case law in this area.  For example, in

United States v. Thomas, the D.C. Circuit Court of Appeals upheld the admissibility of narcotics

discovered during a search of the defendant's apartment after the defendant was arrested selling

drugs to an undercover police officer.  989 F.2d at 1253.  The search warrant for the apartment

was granted based on the investigating officer's "experience investigating narcotics trafficking,"

and his statement that "in his experience, drug dealers frequently keep business records,

narcotics, proceeds from sales, and firearms in their houses."  The Thomas appeals court

explained the logic behind denying the motion to suppress, saying

> "observations of illegal activity occurring away from the suspect's residence can
> support a finding of probable cause to issue a search warrant for the residence if
> there is a reasonable basis to infer from the nature of the illegal activity observed,
> that relevant evidence will be found in the residence." Id. at 1254.

Similar conclusions were reached by other Circuit courts as well.  See, e.g., United States

v. Feliz, 182 F.3d 82 (1st Cir. 1999) (probable cause for a warrant found because it was

reasonable to suppose "a long-time, successful drug trafficker, possessed at his home 'documents

showing the names and phone numbers of customers and suppliers as well as accounts showing

16

the monies paid and collected.'"), <u>United States v. Riesdesel</u>, 987 F.2d 1383 (8th Cir. 1993)

(lawful seizure of drugs from defendant's car provided probable cause to support issuance of

warrant to search his house); <u>United States v. Angulo-Lopez</u>, 791 F.2d 1394, 1399 (9th Cir. 1986)

(probable cause existed to search defendant's residence, based on reasonable inference that

suspected drug dealer would keep evidence at home); <u>United States v. Cruz</u>, 785 F.2d 399, 406

(2d. Cir. 1986 (probable cause found to search defendant's apartment, although no witness ever

saw defendant or his associates use apartment).  Clearly, probable cause existed in the affidavits.

    **B.**    **Even if the court were to find that probable cause for the search is lacking, the evidence obtained during a search conducted by police officers who in good faith believed the search warrant to be valid, is still admissible.**

.

Even if the court were to find that probable cause was lacking for the search of Bzizell's

residence, the evidence obtained therein would still be admissible because Officer Bellino

believed in good faith that the search warrant was valid.

As a practical matter, following <u>United States v. Leon</u>, 468 U.S. 897 (1984) (even

material misstatements or omissions in affidavit are not fatal to validity of search or arrest, if

officer acted in "good faith"), about the only challenge a defendant might hope to successfully

mount on a search warrant affidavit is that the affidavit contained intentional or reckless

misrepresentations or omissions of material fact as defendant Bizzell does in his Supplemental

Motion to Suppress.  <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

In order to obtain suppression of evidence seized pursuant to a search warrant assertedly

based on a false affidavit, a defendant must show that (1) the affidavit contained false statements

or omissions; (2) the statements or omissions were material to the issue of probable cause; and

(3) the false statements or omissions were made knowingly and intentionally, or with reckless

disregard for the truth.  Franks v. Delaware, supra, 438 U.S. at 155-156.

A false statement or omission is material where, assuming the false statement is excluded from the affidavit or the omission is included in the affidavit, the affidavit will not support a magistrates's finding of probable cause.  See e.g., United States v. Richardson, 861 F.2d 291, 293 (D.C. 1988) (an affiant's false statement in an affidavit that he, as opposed to another police officer, had observed the informant enter the defendant's apartment and leave with drugs is immaterial because it is not necessary for the affiant to base the affidvit on his personal observations; United States v. Pace, 879 F.2d 1218, 1232 (7th Cir.) cert. denied, 110 S.Ct. 3286 (1990)(if other facts in the affidavit establish probable cause, omissions immaterial; affidavit failed to state that another magistrate had previously examined the same affidavit and declined to issue a warrant, a previous search of the defendant's home uncovered only suspected cocaine residue, and the police had previously searched the defendant but did not find cocaine).

The district court's finding regarding the affiant's intentions when he prepared the affidavit will be sustained unless it is clearly erroneous.  United States v. Richardson, supra, 861 F.2d at 293.  At the Franks hearing, the defendant has the burden of proving, by preponderance of the evidence, that the affiant acted in "bad faith" – that is, with the intent to deceive the court or with reckless disregard of the truth (or materiality) of his representations ro omissions.

Before a hearing is required under Franks, the defendant must make a "threshold showing" that the affidavit is false in some material respect:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be support by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by offer of proof.  They should point out specifically the portions of the warrant affidavit that is claimed to be

false; and they should be accompanied by a statement of supporting reasons.
Affidavits or sworn or otherwise reliable statements of witnesses should be
furnished, or their absence satisfactorily explained.

Franks v. Delaware, supra, 438 U.S. at 171.  See United States v. Gaston, 357 F.3d 77 (d.C. Cir

2004)(allegations not sufficiently specific to warrant Franks hearing).  Bizzell has not met his

threshold showing to mandate a Franks hearing.

WHEREFORE all of the forgoing reasons, the government respectfully request that this

Court deny the defendants motions to suppress statements and evidence.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610


By:    _____
Angela Hart-Edwards
Assistant United States Attorney
PA Bar #61468
U.S. Attorney's Office
555 4th Street, N.W., Rm. 44241
Washington, D.C. 20530
(202) 307-0031


**Certificate of Service**

I hereby certify that a copy of the United States' Omnibus Opposition
To Defendants' Pretrial Motions was served by first class mail upon counsel of record for
defendants this 2nd day of February, 2007.


_____
Angela Hart-Edwards
Assistant United States Attorney

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  06-366 (RWR)** |
| | : | |
| **REGINALD BIZZELL,** | : | |
| **RODRIQUEZ SEEGERS,** | : | |
| **Defendants.** | : | |
| _____ | : | |

**ORDER**

This matter is before the Court to suppress statements and evidence by defendants.  The Court, having considered the Defendants Motions to Suppress Statements and Evidence and the Government's Ominbus Opposition thereto, and evidence put on at a hearing this _____ day of March, 2007, it is hereby

ORDERED, that the Defendant Seegers' Motions  to Suppress Statements and Evidence shall be denied;

ORDERED, that the Defendant Bizzell's Motions  to Suppress Statements and Evidence shall be denied

_____
U.S. District Court Judge R.W. Roberts