## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNTIED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **REGINALD BIZELL,** | **:** | **CRIMINAL NO.  06-366 (WRB)** |
| **RODRIQUEZ SEEGERS** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

### NOTICE OF FILING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby provides notice of its filing of a corrected and final copy of its Omnibus Opposition to Defendants' Pretrial Motions.  The government's arguments essentially remain the same.  The Opposition filed on February 2, 2007 as document 17 in this case was not the final version of the pleading.  The corrected copy attached to this Notice is the final version that counsel intended to electronically file, but apparently had not done so.  Defense counsel have no objection to this filing.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
D.C. Bar Number: 451058

By:    _____
Angela Hart-Edwards
Assistant U.S. Attorney
PA Bar 61468
U.S. Attorney's Office
555 4th Street, N.W., Rm. 4241
Washington, D.C. 20530
(202) 307-0031

## **Certificate of Service**

I hereby certify that a copy of the Government's Notice of Filing was served by electronic filing on this 24th day of July, 2007.

_____
Angela Hart-Edwards
Assistant United States Attorney

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO.  06-366 (WRB) |
| | : | |
| REGINALD BIZZELL, | : | |
| RODRIQUEZ SEEGERS, | : | |
| Defendants. | : | |
| _____ | : | |

### UNITED STATES' OMNIBUS OPPOSITION
### TO DEFENDANTS' PRETRIAL MOTIONS

The defendants have filed numerous pleadings including motions to suppress statements and evidence.  This Omnibus Opposition will address these motions seriatim.

### Background

On December 19, 2006, each defendant was indicted in different counts of the same indictment for Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of Title18, United States Code, Section 922(g)(1).

At a hearing or trial in this matter, government counsel expects the evidence to demonstrate substantially the following facts:

On November 22, 2006 at about 2:50 a.m., United States Park Police (USPP) Officer Joseph Bellino monitored Prince Georges County channel 4 radio broadcasts where he heard a broadcast for "shots fired" at the Prince Georges County Tradewinds Night Club (Tradewinds). Having patrolled the traffic leaving Tradewinds on previous occasions, Officer Bellino knew that many patrons would leave Tradewinds by vehicle for the District of Columbia (the District) by way of Branch Avenue to the Suitland Parkway.  In response to the dispatch for "shots fired,"

Officer Bellino decided to sit in his parked marked cruiser in a position which enabled him to monitor traffic coming into the District by way of Branch Avenue to the Suitland Parkway.

Within minutes after positioning himself so he could monitor traffic coming into the District by way of Branch Avenue near the Suitland Parkway entrance ramp, Officer Bellino observed a white Buick Regal traveling at a high rate of speed from the direction of the Tradewinds Night Club. The vehicle did not have its headlights on, passed another car, crossed the median driving into lanes for oncoming traffic, and then traveled onto the ramp for the Suitland Parkway. Believing that the occupants of this vehicle may have had something to do with the shooting, as well as having observed the numerous traffic violations, Officer Bellino traveled behind the vehicle with his overhead lights and siren activated. The Buick refused to stop and fled at a higher rate of speed until the driver lost control and crashed into a tree at the intersection of Southern Avenue and 6th Street, N.E..

Immediately after crashing, defendant Seegers bailed out of the driver's seat of the vehicle. The passenger remained in the vehicle. Seegers got out of the vehicle in the street and ran onto the sidewalk where he stopped briefly. At the brief stop, he reached into the waist area of his clothing and retrieved an object and dropped it to the ground. Officer Bellino had exited his cruiser and had begun to chase Seegers when he saw Seegers fumbling in his waist area and heard the object hit the ground. Officer Bellino did not stop to see what the object was, but rather continued to chase Seegers on foot. No one else was present in the area. Officer Bellino's priority was to apprehend Seegers. Officer Bellino apprehended Seegers about two blocks away from the crashed vehicle.

2

Officer Bellino placed handcuffs on Seegers and escorted him back to the police cruiser for transport to the police station. The escort of Seegers back to the cruiser was a retrace of the path of the chase including the location where Officer Bellino heard metal hit the sidewalk. During this escort, Officer Bellino dispatched a "lookout" (description) of what he observed of the passenger over the radio.[1] The description was for a "medium brown skinned female with long braids and a white shirt." In response to hearing that description of the passenger, later identified as defendant Bizzell - who wore long braids and a white tee shirt - defendant Seegers blurted, "no, it was a male." In addition, on the ground in front of the Buick where Seegers was observed reaching into the waist area of his clothing and where Bellino heard the sound of metal hit the sidewalk, a .380 cal semi-automatic pistol was recovered.

Metropolitan Police Department (MPD) Sergeant (Sgt.) Richard Harger arrived at the scene of the crime in response to Officer Bellino's radio broadcast. While driving towards the crashed vehicle, Sgt. Harger slowed down and observed defendant Bizzell getting out of the front passenger seat of the Buick. Not knowing Bizzell was one of the suspects at the time, Sgt. Harger continued to drive down the street to locate Officer Bellino. United States Park Police Officer Jason Omo also arrived to assist Officer Bellino. As Officer Omo drove slowly towards the Buick, he saw defendant Bizzell standing in the rear of the vehicle on the driver's side next to the rear wheel. Officer Omo slowed down to stop at the Buick. At that moment, Bizzell pointed down the street toward Galveston Place to where Officer Bellino had chased Seegers. Not knowing Bizzell was one of the suspects at the time, Officer Omo continued slowly down the street and met up with Sgt. Harger and Officer Bellino.

---

[1] Provided to defense in discovery.

3

When Officer Omo arrived to where Sgt. Harger and Officer Bellino were located, Sgt. Harger pointed back toward the Buick commanding Officer Omo to "get that guy [Bizzell]." When Officer Omo turned around to view the crashed vehicle, Bizzell was no longer in the area.

After Seegers' arrest, the officers searched the entire passenger compartment of the Buick. Six 9mm shell casings were recovered from the Buick - - three shell casings on the driver's side floor board and three shell casings under the driver's seat. Mail matter and repair bills in Seegers' name were found in the map pocket on the driver's seat. In addition to items belonging to Seegers, a wallet that contained Bizzell's driver's license and identification was recovered from the front passenger side floor board.

While the officers were processing the Buick, they observed Bizzell exit a wooded area and walk down Southern Avenue away from the scene as if he was an innocent bystander. Bizzell was stopped and placed under arrest. Bizzell stated that he had just left his girlfriend's home and was walking to his residence and had nothing to do with the vehicle pursuit. Search of Bizzell incident to arrest revealed a cell phone and a card advertising the Trade Winds Night Club. Seegers and Bizzell were placed in a cruiser for transport.

A tow truck was brought to the scene to tow the Buick to the police impound lot. When the tow truck pulled the Buick back from the tree into which Seegers had crashed, officers saw a second gun - - a ministorm 9mm pistol - - lying on the ground where Bizzell was standing during the chase.[2]

---

[2] The pistol had one spent shell casing in the chamber and two live rounds in the magazine. All of the ammunition in the pistol had the brand name of "WIN". One of the 9mm shell casings that had been recovered from inside the Buick had the brand name of "WIN" and the other five shell casings that had been recovered in the Buick had the brand name "FC".

4

Bizzell and Seegers were transported to the station and placed in separate cells.  While the defendants were waiting to be processed the officers overheard defendants talking to each other.  Officer Bellino recorded the following conversation in his notebook as the defendants spoke with each other:

| | |
|---|---|
| Seegers: | Yo Homie. |
| Bizzell: | Yeh. |
| Seegers: | Both. They got both. |
| Bizzell: | Yeh. I know. I already chalked that one up. |
| Seegers: | Both. |
| Bizzell: | Yeh. Man, I was in the house. |
| Seegers: | Both. |
| Bizzell: | Yeah. I left that one on the car.  I got rid of it before I went in the house. |
| Seegers: | We are done. |
| Bizzell: | Did they do that gun powder shit on you too? |
| Seegers: | Yea.  Damn we are done. We are through. |
| Bizzell: | Yea, I know. |

While at the police station, each defendant signed PD 47s waiving their rights and gave videotaped statements in response to police questioning after they were advised of their Fifth and Sixth Amendment rights.  As the videotapes show, neither defendant was threatened, physically abused, made promises of leniency , tricked, were of sound mental and physical condition, and the length of questioning was less than one hour.  In their statements, they deny being with each other and possessing any handgun.

On November 27, 2006, USPP Bellino presented two Applications and Affidavits in Support of Search Warrants to U.S. Magistrate Judge Alan Kay of the U.S. District Court for the District of Columbia.  The application and affidavit requested authority to search the entire premises of 133 Irvington Street, Apartment #205, SW - the residence of Seegers - and 300 Livingston Terrace, Apartment #5, SE the residence of Bizzell.  Magistrate Kay reviewed the

applications and affidavits, concluded that each established probable cause to believe that a variety of items, including evidence related to items described in USPP Bellino's Affidavits would be found on the described premises, and authorized the search warrants.  A copy of the search warrants and affidavits are attached.  The search warrants were executed on November 28, 2006.

Recovered from Seegers' residence was mail matter belonging to him and a tablet of suspected Ecstacy.  Recovered from Bizzell's residence was Bizzell's mail matter, photographs, and personal belongings within certain drawers of dressers within the only bedroom of an apartment and on one side of the shared closet inside of the bedroom.  The closet contained female items on one side and male (Bizzell's) items on the other.  On Bizzell's side of the closet, MPD officers found a Savage 20 gauge shotgun model 220L-E 20 serial #P306936 wrapped in a purple Bucks basketball jersey similar to one Bizzell wore in displayed photographs throughout the apartment.[3]   Officers also found drug paraphernalia (empty ziplocks), earplugs, and 30 grams of suspected marijuana.

On January 22, 2007, Seegers moved to suppress all evidence flowing from his "unlawful stop," including the pistol he abandoned, his statement ("it was a male") he blurted, and all evidence seized from the passenger compartment of the vehicle he was driving, on the grounds that the stop was in violation of United States v. Hill, 131 F. 3rd 1056 (D.C. Cir. 1997).  In addition, he moved to suppress his videotaped statement on the grounds that the statements were obtained involuntarily, therefore in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  His

---

[3] DNA samples were taken from the shot gun and sent to FBI for analysis.  An expedited analysis was requested.

motions are without merit and should be denied.

On January 22, 2007, defendant Bizzell moved this court to suppress his videotaped

statement as unreliable and in violation of <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991) and

<u>Mincey v. Arizona</u>, 437 U.S. 385 (1978), due to the "belligerent, caustic, and mendacious

manner in which the detective questioned Bizzell.  Bizzell also moves this court to suppress all

evidence seized pursuant to the search warrant of his residence alleging that the search warrant

was not based on probable cause.  On February 2, 2007, Bizzell supplemented his motion to

suppress evidence obtained pursuant to the search warrant.  Bizzell's motions are without merit

and should be denied.

## ARGUMENT

1.    **The warrantless arrest of defendant Seegers was lawful and based on probable cause.**

Probable cause must be evaluated in terms of the totality of the circumstances, as viewed

by a reasonable and prudent police officer in light of his training and experience, that would lead

the officer to believe that a criminal offense had been or is being committed.  <u>See</u> <u>United States</u>

<u>v. Green</u>, 216 U.S. App D.C. 329, 670 F. 2d 1148 (1981); <u>Brinegar v. United States</u>, 338 U.S.

160 (1949).  As explained by the District of Columbia Court of Appeals,

> probable cause exists 'where the facts and circumstances within . . . [the police
> officers'] knowledge and of which they had reasonably trustworthy information
> [are] sufficient in themselves to warrant a man of reasonable caution in the belief
> that' an offense has been or is being committed," <u>Price v. United States</u>, 429 A.2d
> 514, 517 (D.C. 1981); [t]he question is what constituted probable cause in the
> eyes of the reasonable, cautious and prudent police officer under the
> circumstances of the moment.  <u>Id</u>. At 517-518 (quoting <u>Bell v. United States</u>, 102
> U.S. App. D.C. 383, 254 F.2d 82, 86 <u>cert</u>. <u>denied</u>, 358 U.S. 885 (1958)).

The Fourth Amendment generally permits police to make warrantless arrests upon probable cause for misdemeanors committed in their presence and for any felony.  United States v. Watson, 423 U.S. 411 (1976).   Clearly, USPP Bellino had probable cause for arresting Seegers.  Seegers had just violated more than three traffic laws for which he was issued citations, he failed a Field Sobriety Test, was found to be driving under the influence of alcohol, and he knowingly fled from a police officer while committing those infractions.  Indeed, USPP Bellino had his police equipment activated during the high speed chase. As a convicted felon, Seegers was clearly aware that he was being pursued by an officer.  The totality of circumstances clearly suggest probable cause for Seegers' arrest.

**2.     The search of Seegers' entire passenger compartment of the vehicle he drove was a lawful search incident to a lawful arrest, therefore the fruits of the search should not be suppressed.**

After making a valid arrest, the police may search a car incident to the arrest of an occupant or a "recent occupant" of the car.  See Thornton v. United States, 541 U.S. 615 (2004) (defendant had just exited car and was next to it when search occurred).  Seegers status as a recent occupant turns "on his temporal or spacial relationship to the car at the time of the arrest and search." Id. at 621.  Immediately after Seegers crashed into the tree, he bailed out and was caught only two blocks away within seconds.  The officer witnessed the crash and the flight.  The incident happened so quickly that Seegers must be considered a recent occupant of the vehicle and therefore the search was lawful under Thorton.  Automobile searches extend to all parts of the vehicle, and closed containers therein that might conceal the object of the search.  California v. Acevedo, 111 S. Ct. 1982 (1991).  Since we have a valid arrest of Seegers and Seegers was

8

seen operating that vehicle right before his arrest, the officers clearly had probable cause to

search the passenger compartment of the vehicle.[4]    Therefore, defendant's motion to suppress

the fruits of the search of the vehicle should be denied.

3.    **The defendant has no expectation of privacy in .38 semi-automatic pistol that he
threw to the ground during the chase**

As Justice Harlan explained in his concurring opinion in <u>Katz v. United States</u>, 389 U.S.

347, 361 (1967), a "reasonable," or "legitimate" or constitutionally protected expectation of

privacy must have two parts: "first, that a person have exhibited an actual (subjective)

expectation of privacy and, second, that the expectation be one that society is prepared to

recognize as "reasonable."" Here, the defendant exhibited no actual or subjective expectation of

privacy in the pistol when he threw it to the ground.   The defendant abandoned the pistol when

he threw it to the ground.   There is no expectation of privacy in items abandoned [to the public

view].  <u>See</u> <u>United States v. Thomas</u>, 864 F.2ds 843 (D.C. Cir 1989)

4.    **The video taped statements**

A.    **Defendants Knowingly, Intelligent, and Voluntarily  Waived Their Miranda
Rights**

The Due Process Clause of the Fifth Amendment bars the admission in a federal criminal

trial of admissions or confessions that were made involuntarily.  <u>See</u> <u>Mincey v. Arizona</u>, 437

U.S. 385, 398 (1978).  However, when an accused challenges the admissibility of a confession or

admission on the grounds of involuntariness, the government need only prove voluntariness by a

preponderance of the evidence.  <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 488-89 (1972); <u>United</u>

---

[4] An argument by the defendant that the search of the vehicle was unlawful because it occurred
after the chase would fail because searches incident to arrest need not precisely coincide with the
timing of he arrest.  <u>See</u>, <u>e.g.</u>, <u>United States v. Edwards</u>, 415 U.S. 800 (1974).

9

States v. Bernett, 161 U.S. App. D.C. 363, 381 n. 140, 495 F.2d 943, 961 n. 140 (1974).   The

Supreme Court has indicated that voluntariness should be determined with reference to the

totality of the circumstances, and that the ultimate question is whether the suspect's "will has

been overborne" by "coercive police activity."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

A waiver is knowing and valid when "made with a full awareness both of the right being

abandoned and the consequences of the decision to abandon it."  Colorado v. Spring, 479 U.S.

564, 573 (1987).  That is, the suspect must understand the nature of the Miranda rights and the

general consequences of making a statement -- i.e., that it can be used to incriminate the suspect.

See also, United States v. Bradshaw, 935 F.2d 295 (D.C. Cir. 1991) (valid waiver determined by

voluntariness of decision to waive and by whether the decision to waive was made with "full

awareness" of "nature" of waived rights, and consequences of waiver) (without citations).

Here, the evidence will establish that before making their video taped statements each

defendant was properly advised of his Miranda rights as a precaution.  In addition, the interviews

took place about four hours after the arrest and two hours after defendant Seegers' alcohol blood

level tested at .086, slightly above the legal limit for alcohol consumption.  The video tapes will

also show that there was no physical abuse by officers, no threat of job loss or threat of any harm

of any kind, no promises of leniency, no trickery to produce an untrue statement, the length of

questioning did not exceed one hour, the defendants were in good mental and physical condition,

they were offered some water, they were not youths - 27 and 31 years old - and they are both

felons with exposure to the criminal justice system.  Moreover, where as demonstrated by the

PD-47s in the present case, the defendants explicitly waived their rights, there exists powerful

evidence of the legitimacy of the waiver.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979)

(express waiver is strong proof of validity of the waiver), <u>United States v. Yunis</u>, 859 F.2d 953, 961-962 (D.C. Cir. 1988) ("[t]he administration of proper <u>Miranda</u> warnings, followed by a written waiver of the rights ... will usually go far toward demonstrating that a decision to speak is not compelled") (without citations). Under the totality of the circumstances, the defendants knowingly, intelligently and voluntarily waived their Fifth and Sixth Amendment rights.

**B.    Defendants' Statements Are the Product of an Essentially Free and Unconstrained Choice and Are Admissible for Impeachment**

Even assuming, <u>arguendo</u>, that officers violated <u>Miranda</u> in obtaining the defendant's statements, they are still admissible at trial for impeachment purposes due to their voluntariness. <u>Harris v. New York</u>, 401 U.S. 222, 224-26 (1971); <u>United States v. Moore</u>, 104 F.3d 377, 388 (D.C. Cir. 1997) (noting use of statements made in violation of Miranda as impeachment material). A statement is voluntary for purpose of due process so long as the statements are "the product of an essentially free and unconstrained choice by its maker." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973); <u>Jackson v. United States</u>, 404 A.2d 911 (D.C. 1979) (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). Factors to be considered include the age of the accused, his lack of education or level of intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. No single criterion is controlling.

As stated above, all factors indicate the defendants statements were voluntary. Moreover, each defendant comfortably and persistently insisted on answers provided even when the detective said he did not believe them; they stuck by their story of denial refusing to "say

11

anything that they did not remember." Even if this Court decides to suppress the statement for use in the government's case in chief, the statements should be admissible for impeachment regardless of the outcome of suppression motion hearing.

**C.    Seegers' blurted statement, "no, it was a male" is not the subject of custodial interrogation and should be admissible for identification purposes**

If a suspect is in custody, but volunteers a statement in the absence of interrogation, there is no <u>Miranda</u> <u>e.g.</u>, <u>Miranda</u> 384 U.S. at 478; <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980). Seeger's correction of USPP Bellino's description of the passenger as a female with long braids by voluntarily stating, "no, it [the passenger] was a male" was not the product of interrogation and therefore is admissible. <u>Maranda</u> does not apply to this statement.

**5.    Search Warrant for Bizzell's Residence[5]**

**A.    The totality of the circumstances surrounding the search warrant for Bizzell's apartment demonstrated probable cause for the search, and all evidence obtained therefrom should be admitted**

The Fourth Amendment of the U.S. Constitution provides that "no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV.  The existence of probable cause should be measured by examining the "totality of the circumstances" surrounding issuance of the warrant. <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 230-31 (1983).  This standard is a "practical, nontechnical conception" measured against the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>See</u> <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76 (1949).  The magistrate issuing the warrant is tasked with inquiring whether, "given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of

---

[5]/ If Seegers made the same claim, the same arguments would be made by the government.

knowledge' of persons supplying hearsay information, there is a fair probability that contraband

or evidence of a crime will be found in a particular place." <u>Gates</u>, 462 U.S. at 238*;* <u>Accord</u>

<u>United States v. Thomas</u>, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (per curiam).  The affadavit from

the police officer need only set forth sufficient facts for a "reasonably prudent person" to believe

evidence of a crime will be found. <u>United States v. Laws</u>, 808 F.2d 92, 94 (D.C. Cir. 1986).

Some guideposts exist for judges to organize this analysis.  For example, there is a

"nexus" requirement, which asks magistrates to ensure that there is "reasonable cause to believe

that the specific 'things' to be searched for and seized are located on the property to which entry is

sought." <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556 (1978).  However, wide latitude and "great

deference" is afforded to the magistrate judge's decision. <u>Spinelli v. United States</u>, 393 U.S. 410,

419 (1969); <u>See also</u> <u>United States v. Ventresca</u>, 380 U.S. 102, 108-09 (1965).  In reviewing a

magistrate's issuance of a search warrant, the court must only determine whether the magistrate

had a "substantial basis for determining the existence of probable cause." <u>Gates</u>, 462 U.S. at

239; <u>Accord</u> <u>United States v.Warren</u>, 42 F.3d 647, 652 (D.C. Cir. 1994).

Here, Officer Bellino observed Seegers driving erratically coming from the direction

where gunshots were just fired.  Seegers fled from Bellino for no reason.  During the foot chase,

Bellino observed Seegers manipulating his waistline area and shortly thereafter heard metal hit

the sidewalk.  Officers Sgt. Harger and Omo saw Bizzell standing behind the Buick near where a

firearm was found.  Officers discovered two firearms where each defendants' was located.  In

addition, the vehicle out of which the defendants bailed contained ammunition of the same type

matching the weapons found outside of the vehicle.  Moreover, a conversation between the

defendants was overheard and recorded simultaneously in writing by Officer Bellino wherein

13

defendant Seegers told Defendant Bizell that "they got both," presumably referring to the firearms, and that "we are through," upon learning that gunpowder tests had been conducted on both defendants.  Based on the officers' experience, individuals who possess firearms outside of the home store such contraband inside of the home.

      With this substantial evidence of probable cause, Officer Bellino submitted an affadavit and was granted a search warrant for Bizzell's apartment by Magistrate Judge Alan Kay on November 28, six days after the incident.  The affadvit delineated four reasonable rationale for why, "based upon [Officer Bellino's] professional training, experience and as an officer enforcing criminal laws against illegal gun possession, and [his] work with other veteran police officers and detectives," he believed the search was justified.  It stated:

- "Persons who keep or carry guns illegally commonly retain items associated with their firearms long after they have bought or got the guns, including the original manufacturer's packaging, gun-cleaning equipment, and additional parts, such as gun sighs, and taht these are almost always stored in the gun-possessor's home; in particular gun-cleaning equipment, which is evidence of illegal gun possession; normally is not carried ona person with a gun, but kept at home, to be used periodically to keep a gun "in shape" or good working order and that such gun possessors buy or get and keep in storage extra ammunition for their firearms, beyond the immediate capacity of the particular firearm; and that they keep such additional ammunition in their homes....

- It is quite common for a person who possesses a firearm to own or possess additional firearms, and that it is common for a person who is found carrying a firearm on his person or in his vehicle to have stored at home one or more additional firearms, along with additional ammunition, and papers related to the acquisition of that firearm....;

- Many persons who illegally possess guns often have pictures taken of themselves with friends in which they display their gun or guns, and that these pictures, themselves excellent evidence of illegal gun possession, [are] commonly kept at the gun possessor's home or in their room at their homes, along with gun paraphernalia;

• Even after an individual's arrest for gun-related charges, the person's family and associates commonly do not dispose of other firearms or ammunition; and even if they do get rid of other guns, they are much less likely to get rid of ammunition, possession fo which almost always [is] a crime in Washington D.C.  Further, hardly ever do such associates remove or get rid of gun packaging or cleaning equipment or photographs of a person with a gun, and ... such items will remain at the arrested individual's home for a considerable period of time after such arrest."

Based upon this affidavit, the magistrate granted the search warrant for Bizzell's residence,[6] presumably because he determined that there was "a fair probability that contraband or evidence of a crime [would] be found [there]."  Gates, 462 U.S. at 238.  In order to make that determination, he must have concluded, per the Supreme Court and D.C. Circuit Courts' guidance, that a "reasonable prudent person" would have seen a sufficient nexus between the defendants' possession of firearms under the Buick and evidence of other firearm possession at Bizzell's apartment.  True to that prediction, a shotgun was found at Bizzell's apartment, wrapped in a Milwaukee Bucks jersee he was pictured wearing all over the house.  Given this established nexus, it is apparent that the search warrant was supported by probable cause, and that its results should be admissible.  And, per the Supreme Court's instruction, this determination by the magistrate should be entitled to "great deference."  Spinelli, 393 U.S. at 419.

This result is supported by an examination of other case law in this area.  For example, in United States v. Thomas, the D.C. Circuit Court of Appeals upheld the admissibility of narcotics discovered during a search of the defendant's apartment after the defendant was arrested selling drugs to an undercover police officer.  989 F.2d at 1253.  The search warrant for the apartment was granted based on the investigating officer's "experience investigating narcotics trafficking," and his statement that "in his experience, drug dealers frequently keep business records,

---

[6] A search warrant was issued for Seegers' residence as well.

narcotics, proceeds from sales, and firearms in their houses." The <u>Thomas</u> appeals court

explained the logic behind denying the motion to suppress, saying

> "observations of illegal activity occurring away from the suspect's residence can
> support a finding of probable cause to issue a search warrant for the residence if
> there is a reasonable basis to infer from the nature of the illegal activity observed,
> that relevant evidence will be found in the residence." <u>Id.</u> at 1254.

Similar conclusions were reached by other Circuit courts as well. <u>See, e.g.</u>, <u>United States</u>

<u>v. Feliz</u>, 182 F.3d 82 (1st Cir. 1999) (probable cause for a warrant found because it was

reasonable to suppose "a long-time, successful drug trafficker, possessed at his home 'documents

showing the names and phone numbers of customers and suppliers as well as accounts showing

the monies paid and collected.'"), <u>United States v. Riesdesel</u>, 987 F.2d 1383 (8th Cir. 1993)

(lawful seizure of drugs from defendant's car provided probable cause to support issuance of

warrant to search his house); <u>United States v. Angulo-Lopez</u>, 791 F.2d 1394, 1399 (9th Cir. 1986)

(probable cause existed to search defendant's residence, based on reasonable inference that

suspected drug dealer would keep evidence at home); <u>United States v. Cruz</u>, 785 F.2d 399, 406

(2d. Cir. 1986 (probable cause found to search defendant's apartment, although no witness ever

saw defendant or his associates use apartment). Clearly, probable cause existed in the affidavit.

**B.    Even if the court were to find that probable cause for the search is lacking,
the evidence obtained during a search conducted by police officers who in
good faith believed the search warrant to be valid, is still admissible.**

.

Even if the court were to find that probable cause was lacking for the search of Bzizell's

residence, the evidence obtained therein would still be admissible because Officer Bellino

believed in good faith that the search warrant was valid.

As a practical matter, following <u>United States v. Leon</u>, 468 U.S. 897 (1984) (even material misstatements or omissions in affidavit are not fatal to validity of search or arrest, if officer acted in "good faith"), about the only challenge a defendant might hope to successfully mount on a search warrant affidavit is that the affidavit contained intentional or reckless misrepresentations or omissions of material fact as defendant Bizzell does in his Supplemental Motion to Suppress. <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

In order to obtain suppression of evidence seized pursuant to a search warrant assertedly based on a false affidavit, a defendant must show that (1) the affidavit contained false statements or omissions; (2) the statements or omissions were material to the issue of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. <u>Franks v. Delaware</u>, <u>supra,</u> 438 U.S. at 155-156.

A false statement or omission is material where, assuming the false statement is excluded from the affidavit or the omission is included in the affidavit, the affidavit will not support a magistrates's finding of probable cause. <u>See</u> <u>e.g.</u>, <u>United States v. Richardson</u>, 861 F.2d 291, 293 (D.C. 1988) (an affiant's false statement in an affidavit that he, as opposed to another police officer, had observed the informant enter the defendant's apartment and leave with drugs is immaterial because it is not necessary for the affiant to base the affidvit on his personal observations; <u>United States v. Pace</u>, 879 F.2d 1218, 1232 (7th Cir.) <u>cert</u>. <u>denied</u>, 110 S.Ct. 3286 (1990)(if other facts in the affidavit establish probable cause, omissions immaterial; affidavit failed to state that another magistrate had previously examined the same affidavit and declined to issue a warrant, a previous search of the defendant's home uncovered only suspected cocaine residue, and the police had previously searched the defendant but did not find cocaine).

17

The district court's finding regarding the affiant's intentions when he prepared the affidvit will be sustained unless it is clearly erroneous. <u>United States v. Richardson</u>, supra, 861 F.2d at 293. At the <u>Franks</u> hearing, the defendant has the burden of proving, by preponderance of the evidence, that the affiant acted in "bad faith" – that is, with the intent to deceive the court or with reckless disregard of the truth (or materiality) of his representations ro omissions.

Before a hearing is required under <u>Franks</u>, the defendant must make a "threshold showing" that the affidavit is false in some material respect:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be support by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by offer of proof. They should point out specifically the portions of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

<u>Franks v. Delaware</u>, <u>supra</u>, 438 U.S. at 171. See United States v. Gaston, 357 F.3d 77 (d.C. Cir 2004)(allegations not sufficiently specific to warrant <u>Franks</u> hearing).

Bizzell has not met his threshold showing to mandate a <u>Franks</u> hearing. Bizzell's entire contention regarding false or omitted facts from the affidavit hinges on the officer's omission of the mistake he made on Bizzell's gender in his lookout to other police officers during his escort of Seegers to his cruiser. This fact, however, is not material and would not changed the probable cause finding by the magistrate. This is especially true because Seegers corrected Officer Bellino's lookout by stating "no, it was male." As the radio run reveals, the correction was broadcasted. So even if the officer included the mistake, naturally, inclusion of the correction would follow as part of the entire lookout. Bizzell's allegations are merely conclusory and

18

contains no allegations of deliberate falsehood on the part of the Officer Bellino.  Therefore, a

<u>Franks</u> hearing is not warranted.

WHEREFORE all of the forgoing reasons, the government respectfully request that this

Court deny the defendants motions to suppress statements and evidence.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610


By:    _____/s/_____
       Angela Hart-Edwards
       Assistant United States Attorney
       PA Bar #61468
       U.S. Attorney's Office
       555 4th Street, N.W., Rm. 44241
       Washington, D.C. 20530
       (202) 307-0031


<u>**Certificate of Service**</u>

I hereby certify that a Corrected copy of the United States' Omnibus Opposition
To Defendants' Pretrial Motions was served electronically upon counsel of record for defendants
this 24th  day of July, 2007.


_____
Angela Hart-Edwards
Assistant United States Attorney