IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 06-366 (RBW) |
| ) | |
| RODRIGUEZ SEEGERS, ) | Sentencing Date: April 16, 2008 |
| ) | |
| Defendant. ) | |

**DEFENDANT RODRIGUEZ SEEGERS'S
MEMORANDUM IN AID OF SENTENCING**

On January 7, 2008, Mr. Seegers plead guilty to one count of unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term of one year, in violation of 18 U.S.C. § 922(g)(1). Mr. Seegers will appear before this Honorable Court for sentencing on April 16, 2008 at 9:00am. In its consideration of the section 3553(a) factors, the defense respectfully asks the Court to consider in particular the following circumstances: (1) Mr. Seegers has a remarkably consistent and successful work history, and clearly has a very strong work ethic, (2) Mr. Seegers has only one prior conviction, from an incident that occurred when he had just turned 17-years old, (3) Mr. Seegers's poor health situation, and (4) that Mr. Seegers may still be facing a parole revocation sentence following his sentence in this case. Based on those circumstances, as well as the other Section 3553(a) considerations, the defense respectfully submits that the Court's sentence in this case should certainly be no higher than the low end of Mr. Seegers's Guidelines range, *i.e.*, 30 months.

**DISCUSSION**

A.   **Arrest and Procedural History.**

This case results from a very foolish and juvenile incident where Mr. Seegers and his best friend (and former co-defendant), Reginald Bizzell, went out before the Thanksgiving holidays in November 2006 and got far too drunk.  After a day spent working at his construction job, Mr. Seegers and Mr. Bizzell had a few drinks and went to a nightclub, Tradewinds, where they over-indulged in alcohol.  Mr. Seegers had very recently, and very unwisely, purchased a handgun from an individual who came by the neighborhood selling guns and asked Mr. Seegers if he wanted one.  (The photographs of the handgun corroborates Mr. Seegers's statement that this was a new gun, *see, e.g.,* Exhibit 1).  The gun was in Mr. Seegers's car because he had to hide it from his parents and his girlfriend, who would have found it in the home.

At approximately 2am, Mr. Seegers and Mr. Bizzell left Tradewinds in Mr. Seegers's car.  While leaving, they foolishly fired their guns up in the air.  As the subsequent police investigation confirmed, Mr. Seegers and Mr. Bizzell were not arguing with anyone, and this was not an attempt to shoot at anyone.  It was just a stupid decision to show off their new handguns, which Mr. Seegers had never shot before, "old-West" style.  Following a police chase, Mr. Seegers was apprehended in the area of Southern Avenue and Sixth Streets, SE.  Mr. Seegers had surrendered to a pursuing Park Police officer after a very brief foot chase.

Following his first appearance in District Court on November 24, 2006, Mr. Seegers did not seek bail because of a promised detainer from the United States Parole Commission.  Mr. Seegers was on parole from a Youth Rehabilitation Act conviction which he incurred just after

2

turning 17 years old. *See* discussion, *infra*. Mr. Seegers's parole was and is scheduled to expire on May 18, 2008. *See* PSR, ¶ 24. Although a Parole Commission detainer has now been pending for well over a year, the Parole Commission has not yet conducted Mr. Seegers's parole hearing. Thus, following the sentencing in this case, Mr. Seegers will still have to face the U.S. Parole Commission, which will determine whether and what length of time Mr. Seegers will have to serve up and above his sentence in this case.

**B.      Personal Background of Mr. Seegers.**

Rodriguez Seegers is now 31 years-old. He is the son of Oscar and Marlene Seegers. *See* PSR, ¶ 30. Mr. Seegers has three siblings. *See id.*, ¶ 31. The family, which has faithfully attended all court hearings in this case, is clearly very tight-knit. Mr. Seegers describes the main hardship of prison as "not getting to spend time with my family."

Since 2004, Mr. Seegers has been in a committed relationship with his girlfriend, Wendy Tubbs. Once Mr. Seegers is done with this case, he plans on marrying Ms. Tubbs. While Mr. Seegers has no children at this point in time, he and Ms. Tubbs speak hopefully about starting a family together someday in the close future.

**C.      Mr. Seegers's Prior Youth Act Conviction.**

Mr. Seegers has only one prior conviction, a Youth Act conviction from an incident that occurred when he had just turned 17 years old. On May 19, 1993, Mr. Seegers was involved in a shooting incident with a man who was his best friend at the time. The two had a heated argument over money and possession of the gun, which they had purchased together. Mr. Seegers reports that the individual then tried to stab him. Regrettably, Mr. Seegers responded to the attack by shooting the individual.

3

On January 7, 1994, Mr. Seegers was sentenced under the Youth Rehabilitation Act to 15 years imprisonment. Mr. Seegers served approximately nine years of that time at the Lorton Youth Center at the Lorton Correctional Center, and was then transferred to two different federal institutions for brief periods before his release to parole in April 2002. From April 2002 until his arrest in this case, in November 2006, Mr. Seegers incurred no new arrests or convictions.

* * *

It is noteworthy that Mr. Seegers's prior conviction--which stems from an act Mr. Seegers committed when barely 17 years old--is already double counted under the Guidelines. Under section 2K2.1(a)(4), Mr. Seegers's prior conviction causes an increase not only to his criminal history (from a I to a II), but also to his offense level (from a 14 to a 20). *See* PSR, ¶ 14. In the absence of this increase in Mr. Seegers's offense level, his Guidelines range in this case would be only 15-21 months (offense level 14, minus 2 points for acceptance of responsibility), an amount of time Mr. Seegers has already served at CTF. Thus, even though Mr. Seegers's prior conviction involves difficult circumstances, the defense respectfully submits that it would be grossly unfair to use this conviction to increase Mr. Seegers's sentence yet again, through a sentence above the low end of his Guidelines range. This is particularly true given Mr. Seegers's young age (17 y.o.) when this incident occurred.

It would also be unfair to increase Mr. Seegers sentence because of the other information in paragraph 24 of the PSR, which concerns Mr. Seegers's "Institutional Adjustment." Mr. Seegers adamantly denies the sexual misconduct allegation made by a fellow inmate at Lorton, which was never established at any kind of hearing whatsoever and was not pursued as a "no benefit" case in Superior Court. Mr. Seegers reports that the fellow inmate fabricated this charge

because of a dispute over concession items. The inmate had never sought medical treatment stemming from the supposed attack, and later confessed that he had made the whole thing up.

Furthermore, there do not appear to be any Superior Court records supporting the proposition that Mr. Seegers was denied the benefit of the Youth Rehabilitation Act. Mr. Seegers's explanation for why he left Lorton–because of Lorton's closing, and not because of any misconduct, *see* PSR, "Objections"–is fully consistent with Lorton's closing date of 2001.

The allegations of misconduct are also belied by Mr. Seegers adjustment once released to parole on April 17, 2002. From that date until his arrest in this case in November 2006, Mr. Seegers fully complied with all conditions of his parole, and incurred no new arrests or convictions. Rather, he was doing exactly what society asks of him, and what he will be doing once released from this case: working and taking care with his family.

**D.    Employment.**

There can be no question that Mr. Seegers has a very solid work ethic. The PSR reports that, according to Mr. Seegers's mother, Mr. Seegers has had this characteristic since a young age. *See* PSR, ¶ 35 ("Mrs. Seegers indicated that the defendant was very helpful as a child and helped her with his siblings. She reported that the defendant was always an 'A or B' student, and was 'handy' with his hands, and repaired things around the house"). Notably, all the children from the Seegers's household are employed full time, as was Mr. Seegers prior to his arrest in this case. *See id.*, ¶ 31.

Mr. Seegers rightly takes great pride in his work history. Since Mr. Seegers release from his Youth Act sentence in 1992, he has worked as a skilled carpenter with two different construction companies. *See* PSR, ¶ 45. As noted in the PSR at footnote 2 (page 11), Mr.

Seegers successfully completed a carpentry apprenticeship program and has received his graduation certificate. *See* Exhibit 2 (District of Columbia Certificate of Completion of Apprenticeship). Since April 2003, Mr. Seegers has worked for the same construction company, John H. Hampshire, in Baltimore, Maryland. *See id.* Mr. Seegers is clearly a valued employee. *Id.* ("According to the employer, the defendant was considered a valuable employee, reported to work on time, and was consistent in his work ethic. The employer further reported that defendant was a union carpenter, and skilled (mechanic) journeyman"). The company has told Mr. Seegers that he is welcome back to work upon his release from incarceration in this case.

Once Mr. Seegers is back at work, he plans on taking a construction management course that would enable him to obtain a promotion with the Hampshire company. Mr. Seegers's ultimate goal is to become a project manager and construction superintendent. These goals appear to be well within Mr. Seegers's reach given his obvious skills and impressive track record as an employee in the construction industry.

**D.      Mr. Seegers's Health.**

Though young, Mr. Seegers has already experienced bouts with poor health that have been nearly fatal. Just since his incarceration at CTF in this case, in November 2006, Mr. Seegers experienced a very dangerous episode involving a blood clot in his lung. *See* Exhibit 3 (Greater Southeast Hospital Records). Mr. Seegers had to be rushed from CTF to Greater Southeast Hospital to receive emergency surgery. He was subsequently hospitalized for two weeks. Prior to that experience, in 2003, Mr. Seegers suffered from a blot clot in his leg. As discussed in the PSR, Mr. Seegers must take Coumadin, a blood-thinning drug, on a daily basis for the rest of his life, in the hopes of avoiding future blot clots and/or a heart attack.

E.     **Application of Section 3553(a) to Rodriguez Seegers.**

The Presentence Investigation Report calculates the applicable sentencing range under the United States Sentencing Guidelines (hereinafter "Guidelines") as a range of 30 to 37 months incarceration. The defense has no objection to this calculation. The defense respectfully urges the Court not to sentence Mr. Seegers above the lowest end of that range, however, as there are at least four circumstances that militate in favor of a sentence no greater than 30 months: (1) Mr. Seegers has a remarkably consistent work history, and clearly has a very strong work ethic, (2) Mr. Seegers has only one prior conviction, from an incident that occurred when he had just turned 17-years old, (3) Mr. Seegers's poor health situation, and (4) that Mr. Seegers may still be facing a parole revocation sentence following his sentence in this case. Based on those four factors, discussed *supra*, as well as the other section 3553(a) considerations, the defense respectfully submits that the just sentence in this case is certainly no more than 30 months.

**CONCLUSION**

For the foregoing reasons, and such other reasons as the Court deems just and proper, Mr. Seegers respectfully requests that the Court impose a sentence no more than 30 months, which is the low end of the Guidelines range and also the sentence that will be recommended by the government. Furthermore, the defense respectfully requests that the Court recommend that the U.S. Parole Commission run Mr. Seegers's parole revocation sentence concurrently with his sentence for the instant case.

Respectfully submitted,
A.J. Kramer
Federal Public Defender


_____/s/_____
Jonathan S. Jeffress
Counsel for Rodriguez Seegers
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500, ex.134

# Exhibit

# 1



GOVERNMENT EXHIBIT
No. 95
(Criminal No. 06-366)

# Exhibit

# 2



# Exhibit

3

| | |
|---|---|
| Greater Southeast Community Hospital<br>1310 Southern Avenue S.E.<br>Washington, D.C.   20032 | NAME: NOINFOSEEGARS,RODRIG   UNIT #: M00927468<br>ACCT #: V00000819150          ROOM: 733-B<br>ATTENDING: SIMA NOURANI, MD     DOB:05/11/76<br>DICTATED BY: SIMA NOURANI, MD |
| TRANSFER SUMMARY FORM<br>0103-0033 | ADMIT DATE: 12/18/06   DISCHARGE DATE: 01/03/07 |

DISCHARGE DIAGNOSES:
1. Bilateral pulmonary emboli.
2. History of pulmonary emboli.
3. History of deep vein thrombosis.

DISCHARGE MEDICATIONS:
1. Coumadin 10 mg p.o. daily.
2. Percocet 2 tablet p.o. q.6 h. p.r.n. for pain.
3. Axid 150 mg p.o. b.i.d.

DIAGNOSTIC TESTS:  CT scan of chest with IV contrast done on December 18, 2006, showed:

1. Diffuse pulmonary emboli in the upper and lower lobes bilaterally and bilateral main pulmonary arteries.
2. The findings are consistent with thrombus of the superior vena cava.

CT scan of the head and brain without IV contrast done on December 18, 2006, was unremarkable.

A 2D echocardiogram done on December 19, 2006, revealed suboptimal study, right atrium and right ventricle enlarged.  All other chambers appeared to be normal size.  Valvular leaflets not well seen.  The left ventricle appeared to be near the upper limits of normal, slightly thickened.  Left ventricle contracts symmetrically and well within normal range.  Ejection fraction approximately 60% to 70% and essentially unremarkable.  The coagulation and hypercoagulability studies were sent to the lab showed proteins on December 26, 2006. Protein C levels 92 and the reference range is 70% to 140%.  Protein S total 109, the reference range is 70% to 140%.  Protein S free 63, and the reference range is 57% to 171%.  Factor V 134, reference range is 65% to 150%.

PROCEDURES:  On December 22, 2006, insertion of inferior vena cava filter without any complications.

HOSPITAL COURSE AND THE PATIENT'S MEDICAL HISTORY:  This is a 30-year-old male with past medical history of pulmonary emboli and treated with Coumadin in the past presented to the emergency room with chief complaint of substernal chest pain, and while in the emergency room initially, the patient had refused workup and refused admission, chest pain rule out acute coronary syndrome protocol, and left the hospital against medical advice; however, the patient stated that while on the way out, he collapsed and he was brought back to the emergency room.  He complained of having chest pain for the past week

| | |
|---|---|
| Greater Southeast Community Hospital<br>1310 Southern Avenue S.E.<br>Washington, D.C.   20032 | NAME: NOINFOSEEGARS,RODRIG   UNIT #: M00927468<br>ACCT #: V00000819150         ROOM: 733-B<br>ATTENDING: SIMA NOURANI, MD     DOB:05/11/76<br>DICTATED BY: SIMA NOURANI, MD |
| <u>TRANSFER SUMMARY FORM</u><br>0103-0033 | ADMIT DATE: 12/18/06   DISCHARGE DATE: 01/03/07 |

prior to admission, substernal in the location with little radiation to the right side 8/10 in intensity at that time maximum 10/10 in the intensity. So, denied any palpitations at that time, and the patient had not been taking Coumadin for a long time, and he said that he had finished his course of Coumadin for PE at that time. So, the patient was diagnosed with bilateral pulmonary emboli with CT scan with IV contrast done in the emergency room, and was started on heparin drip and Coumadin next day and the patient was hemodynamically stable and his hospital stay was not significant for any cardiac event, and he responded well to the therapy. The problem was with getting the INR in therapeutic level, probably was interfering with the patient's diet at the hospital, and the patient remained hemodynamically stable without complications and shortness of breath, and he was seen and evaluated from pulmonologist and Dr. Nedd the vascular surgeon, and plan to have IVC filter inserted, which was done on December 22, 2006, and went without complications, no bleeding, and the patient tolerated the surgery well, and after that remained hemodynamically stable and afebrile and became more ambulatory.

On physical examination today, the patient's vital signs: Temperature 97.2, blood pressure 131/65, respiratory rate 20, and pulse is 76. The patient is sitting on the bedside in no acute respiratory distress. No chest pain. No nausea or vomiting. No abdominal pain. No dizziness. No weakness. No vertigo. Head is normocephalic. HEENT: PERRL. EOM intact. Anicteric sclerae bilaterally. No conjunctivitis. Neck is supple. No JVD. No lymphadenopathy. No thyromegaly. No carotid bruits. Thorax Examination: Bilateral vesicular breath sounds. Clear to auscultation. No crackles. No wheezing. COR Examination: S1 and S2 normal and regular. No S3 and no S4 gallops. Abdomen is soft and nontender. Normoactive bowel sounds. No palpable mass appreciated. Lower Extremities: No pedal edema. Palpable distal pulses. Bilateral equal reflexes of +2. Motor is 5/5 throughout the extremities. Sensation intact in all extremities. No clubbing. No cyanosis. No skin lesions. Central Nervous System Examination: The patient is alert and oriented x3. No focal neurological deficits. Cranial nerves 2 through 12 are grossly intact.

LABS: There were no abnormality in the labs and the coagulation studies done on January 3, 2007, showed PT 17.7, INR 2.09, PTT 28.2.

At this time, the patient is on 10 mg p.o. daily Coumadin and we just increased it for 2 days to 50 mg including today which will be switched to 10 mg p.o. daily again from January 4, 2007, in order to increase the INR level. The patient needs to be monitored for PT, PTT, and INR level daily until the INR becomes therapeutic in the Department of Correction and then can be done as per protocol at

Run: 01/04/07-11:50 by Sima Nourani-Zenuz

TRANSFER SUMMARY - Additional copy                                Page 2 of 3

| Greater Southeast Community Hospital<br>1310 Southern Avenue S.E.<br>Washington, D.C.   20032 | NAME: NOINFOSEEGARS,RODRIG   UNIT #: M00927468 |
|---|---|
| | ACCT #: V00000819150        ROOM: 733-B |
| | ATTENDING: SIMA NOURANI, MD      DOB: 05/11/76 |
| | DICTATED BY: SIMA NOURANI, MD |
| TRANSFER SUMMARY FORM<br>0103-0033 | ADMIT DATE: 12/18/06   DISCHARGE DATE: 01/03/07 |

Department of Correction. We recommend for the first month may be weekly until INR remains more or less stable. We recommend also follow up by Pulmonary Clinic at DC General Hospital within 2 weeks. Diet: No green vegetable. No grapefruit. No broccoli. Food that interfere with Coumadin metabolism. Activity: Activity as comfort permits.

The patient is being discharged to Department of Correction today in hemodynamically stable condition.


SIGNATURE ON FILE
SIMA NOURANI, MD


DICTATION DATE/TIME: 01/03/07 1050
TRANSCRIBED BY: AVICIS TRANSCRIPT        DATE/TIME:  01/03/07 1141
OV ID NUMBER: 1821846305337300

Run: 01/04/07-11:50 by Sima Nourani-Zenuz

TRANSFER SUMMARY - Additional copy                              Page 3 of 3